777 So.2d 630 (2000)
Paul PLAISANCE, Jr.
v.
DEPARTMENT OF SOCIAL SERVICES (Cynthia Carrick Plaisance).
No. 00-CA-1038.
Court of Appeal of Louisiana, Fifth Circuit.
December 27, 2000.
*631 Michael A. Britt, Kenner, LA, Attorney for Defendant/Appellant.
Terri M. Miles, Metairie, LA, Attorney for Plaintiff/Appellee.
Panel composed of Judges JAMES L. CANNELLA, CLARENCE E. McMANUS and H. CHARLES GAUDIN, Pro Tempore.
McMANUS, Judge.
This is an appeal from a judgment of custody and visitation which awarded sole custody of the couple's minor child to the father, Paul Plaisance, Jr. (Plaisance) and provided for supervised visitation with the mother, Cynthia Carrick Plaisance (Carrick). Also on appeal is a second judgment awarding child support. Ms. Carrick appeals.
The record shows that the parties began their relationship in 1989 and were married in 1991. The household consisted of the two parties, Ms. Carrick's two sons by a previous marriage, Sean and Nicholas Tamm, and Mr. Plaisance's severely handicapped son, Paul III. Sean was four-years-old when Mr. Plaisance moved in with Ms. Carrick and Nicholas was about two years younger.
The couple separated in 1992 and divorced in 1993. A son, Sebastian, was born of the marriage, and it is custody of this child that is the subject of this appeal.
During the course of the litigation, allegations of sexual abuse by Mr. Plaisance which involved Ms. Carrick's two minor sons by a previous marriage were made. *632 After a preliminary hearing on the matter, the parties entered into a consent judgment dated January 21, 1993, which awarded joint custody, with Ms. Carrick being the primary custodial parent. The judgment also set forth visitation rights for Mr. Plaisance, pending an evaluation by Diane Huber, a court appointed expert.
On November 3, 1994, the court heard testimony from Officer Antoinette Ulmer of the Jefferson Parish Sheriffs Office, a seven-year veteran who investigated the allegations of sexual and physical abuse made against Mr. Plaisance by Ms. Carrick's sons. Officer Ulmer testified that she interviewed one child through the Children's Advocacy Center and did not believe the child was coerced by anyone into making the allegations. She further testified she found the allegations believable. The investigation was ongoing and Officer Ulmer intended to interview Ms. Carrick's older son, who had also made allegations against Mr. Plaisance, but the interview was delayed due to the child's confinement in Southeast Louisiana State Hospital.
On November 22, 1994, Mr. Plaisance moved for a change of custody, seeking sole custody, or in the alternative, joint custody with Mr. Plaisance designated as the primary custodial parent. On December 14, 1994, Mr. Plaisance filed a motion for supervised visitation. On February 7, 1995 the court issued an order appointing Dr. Alan J. Klein to perform a complete evaluation and to make a recommendation with regard to custody, visitation and allegations of abuse.
Dr. Klein submitted his report to the court on October 26, 1995. The report is extensive and ultimately concludes that Ms. Carrick should be given sole custody of Sebastian with supervised visitation granted to Mr. Plaisance. Dr. Klein explained that he found the history regarding the sexual abuse of Sean and Nicholas "compelling", and that he did not believe joint custody was in the best interest of the child.
Due to those unfavorable reports, Mr. Plaisance moved for a new custody evaluation and to strike Dr. Klein's report. The pleading also sought expanded visitation and an expedited hearing. The trial court conducted a hearing on that motion on August 7, 1996, at which Dr. Klein testified on his evaluation. He described in detail his expertise, his methods and his reasons for the recommendations. He was also questioned at length by counsel for Mr. Plaisance. After taking the matter into consideration, the trial court refused to strike Dr. Klein's report, but ordered that the LSU Department of Psychiatry and Family Clinic be appointed to conduct an evaluation of the parties. That judgment was signed on February 20, 1997.
The record contains a "Plan for Implementation of Order of Joint Custody" dated July 15, 1996, which was apparently intended as a consent judgment. It was read into the record. However, it is signed only by Ms. Carrick. Mr. Plaisance refused to sign the document.
On October 21, 1998, the court rendered an "Interim Order" which orders the parties to make themselves and Sebastian available for evaluations by both court appointed evaluators, Drs. Julie Larrieu and Alan Klein. The order also continues supervised visitation by Mr. Plaisance.[1]
The trial court conducted hearings on the various motions filed by the parties on December 10, and 11, 1998, and January 12, 13, 15, 1999. On January 26, 1999, the court rendered an "interim Order" which provides for supervised visitation by Mr. Plaisance. Further hearings in the matter were conducted on February 9, 10 and March 4, 5, 12, 1999.
*633 On May 18, 1999, the trial court rendered judgment awarding sole custody of the minor child Sebastian to Mr. Plaisance, with supervised visitation for Ms. Carrick. The judgment also orders both parties to immediately enroll in therapy. On May 21, 1999, the trial court rendered a second judgment reducing an earlier judgment of child support owed by Mr. Plaisance, and increasing that owed by Ms. Carrick. It is from these two judgments that Ms. Carrick appeals.
There were three court appointed experts who offered evaluations to the court on matters of custody and visitation. During the proceedings, the court heard testimony from all three and their written reports are contained in the record.
The first expert to testify was Dr. Alan Klein, a clinical psychologist who was appointed by the court to evaluate the parties and the minor child in 1995. Dr. Klein testified that he met with Mr. Plaisance, Ms. Carrick, Sebastian and Ms. Carrick's two sons, Sean and Nicholas. Dr. Klein also spoke with Libby Gist, the clinical social worker and psychotherapist, who was treating Mr. Plaisance. Dr. Klein's evaluation also included a discussion with Dr. Carmen Ramos, the treating psychiatrist at Southeast Louisiana State Hospital, where Sean was confined for several months. Dr. Klein observed Sebastian, who was three-years-old at the time, relate to Ms. Carrick. The relationship was comforting and Sebastian appeared to be a normal, developing child with no indications of any problems of a psychiatric or psychological nature.
Dr. Klein interviewed Nicholas alone, without the presence of his mother. Dr. Klein testified that there were problems between Nicholas, who was about eight-years-old, and his older brother, Sean, who was about ten. The doctor also stated that there was a tremendous amount of conflict in the home. Ms. Carrick had significant problems with parenting. Dr. Klein described the home as a "pretty troubled environment". Dr. Klein testified that Nicholas described being sexually abused by Mr. Plaisance. Nicholas told Dr. Klein that Mr. Plaisance made him touch his (Plaisance's) penis and hold it while Mr. Plaisance urinated. Nicholas also said that Mr. Plaisance touched him on his private part and made Nicholas touch Mr. Plaisance. Nicholas told Dr. Klein he wished Mr. Plaisance was dead.
Dr. Klein explained that he has extensive experience in evaluating and treating sexually abused children. He is the director of a treatment program that works with families in which there has been sexual molestation. That program began in Metairie in 1984, but has been primarily in St. Tammany Parish for the last six years. Dr. Klein has been involved in that program from the beginning. He has received numerous referrals for evaluations of allegations of sexual molestation in cases of divorce. He also treats children who have been victims of sexual molestation by outside offenders which involve criminal proceedings. When asked his opinion of the truthfulness of Nicholas's statements, Dr. Klein explained that he considered the truth to be a matter for the court to decide. However, he did state what Nicholas reported, and the way it was reported, was not inconsistent with reports of valid cases of abuse.
Dr. Klein stated that in his custody evaluations involving allegations of abuse, he looks carefully at whether there are any indications that the child's statements were prompted. He does this by attempting to develop some understanding of the child's memory and recollection, what happened, what kind of facts they can give, and whether it was a one time event or an ongoing situation. In Nicholas's case Dr. Klein had no indication that he was being prompted to report the abuse.
Dr. Klein also interviewed Sean. Sean had been hospitalized numerous times for emotional problems. While there were problems between Sean and his mother in the past, at the time of the interview Sean *634 had a comfortable relationship with her. Dr. Klein asked Sean to tell him about Mr. Plaisance. Sean began by giving Dr. Klein a physical description of his step-father. He stated that Mr. Plaisance was six feet tall and then stopped to ask if that was the kind of information Dr. Klein was looking for. Dr. Klein stated that was revealing and suggested that Sean did not think he was coming in to talk about sex abuse. Dr. Klein simply told Sean that he could share anything he felt like discussing. Sean proceeded further with the physical description. Then Sean stated that Mr. Plaisance "hits me real bad and he kicks me". He related how Mr. Plaisance hit him when his mother was not at home or was out in the yard. Sean could remember no positive aspects of his relationship with Mr. Plaisance.
Even when Dr. Klein asked Sean specifically about sexual abuse, the child was reluctant to discuss the matter. When Sean did relate the details of the sexual abuse to Dr. Klein, it was the doctor's opinion that it was credible and believable. There was no indication that the information was implanted or fabricated. It was an issue the child did not want to deal with anymore. Dr. Klein stated that, frequently if one revisits a problematic concern for a child, the child will try to avoid talking about it. Dr. Klein testified that he certainly would have reported to the judge any indication that Ms. Carrick was manipulating these children to say things about sex abuse. Dr. Klein also testified that he spoke with other mental health professionals who had treated Sean over his extensive hospitalization. They verified the reports of sexual abuse.
Dr. Klein testified regarding the tests administered to the parties. With both Ms. Carrick and Mr. Plaisance, Dr. Klein did the Minnesota Multiphasic Personality Inventory II, which is an objective, self-endorsing assessment of an individual's psychological functioning. Because of the results of the test, the reports of sexual abuse, the history of psychiatric treatment, and his clinical observations, Dr. Klein repeated the test on Mr. Plaisance. Additionally, he administered Rorschach Psycho Diagnostic test.
As to Ms. Carrick, the results were within normal parameters. She was an outgoing, uninhabited, very self-confident female, with no severe emotional turmoil There did not appear to be any chronic psychopathology from the test data. She was stable, reliable, and currently responsible. The conclusions drawn by Dr. Klein regarding Ms. Carrick were that her mental and emotional status were normal, and that she had no psychiatric type problems. Dr. Klein further testified that, while she may have problems parenting, they could be corrected by education because there is no psychiatric basis for the problems.
As to the test results for Mr. Plaisance, Dr. Klein testified that his clinical interview revealed that Mr. Plaisance was very expansive and rambling in his speech patterns. He was vigilant and he had a startled response, which was an indicator that further investigation was necessary. Mr. Plaisance seemed confused, and had trouble providing a chronological history. He was cooperative and seemed to be a pleasant person. However, there was something going on that was psychologically troublesome. Mr. Plaisance revealed that he was under treatment for anxiety and depression. He was seeing a psychotherapist every several weeks, and was currently taking Prozac.
The test results on Mr. Plaisance indicated the profile was extremely elevated which is consistent with individuals who tend to be very tense and anxious. Mr. Plaisance also tends to be highly ruminative, which means that he processes and re-processes information to an abnormal extent in a very obsessive way. That was confirmed by Dr. Klein's clinical observation that Mr. Plaisance rambled and was confused. While the tests results showed no evidence of psychosis, it did reveal a profile of someone who is less well adjusted *635 psychologically. Dr. Klein's opinion was that Mr. Plaisance is not a man who was well equipped to deal with problems and stresses in life. He would often feel helpless and confused. He is a rather withdrawn, somewhat seclusive type of person. In conclusion, Dr. Klein opined that Mr. Plaisance has some very serious personality problems, and that his adjustment should be considered to be maladaptive.
Because the results showed such strong problems, Dr. Klein re-administered the test. In the second test, Mr. Plaisance was less candid and very guarded. Consequently, the level of the scales dropped. However, they still showed anxiety, as well as a seclusive and paranoid personality.
Dr. Klein testified that the results of the Rorschach test showed that Mr. Plaisance was experiencing noticeable distress, the kind that is found in individuals who are under a great deal of situational stress. This will often tend to reduce one's efficiency in functioning.
Dr. Klein summarized the results from all of the testing on Mr. Plaisance by saying that he was concerned with the potential for disorganization in his functioning when under stress. It was also Dr. Klein's impression that Mr. Plaisance was chronically distressed and disorganized.
When asked for recommendations on custody, Dr. Klein stated that, in view of the fact that the child had been in his mother's custody for the first three years of his life, and the results of the tests, it was inconceivable that the parties could co-parent this child. Dr. Klein recommended that Ms. Carrick be the domiciliary parent and have sole custody, because continuity is important for a young child. A second reason for the recommendation is the immediate concerns with regard to the psychological functioning of Mr. Plaisance. Dr. Klein testified that changing custody of a young child who has only seen the other parent on supervised visitation, would only be indicated if there was a showing that the domiciliary parent was abusive. Because there is no such indication in this case, and the mother is providing a nurturing environment for the child, there should be no change of custody.
He felt that a visitation schedule should be set up for Mr. Plaisance and that a responsible adult be with Mr. Plaisance during the visitation. Dr. Klein further recommended that both parties be required to attend training classes in parenting techniques. Further, he recommended that a clinical monitor be selected to be available to address the various parenting concerns presented by both parents.
Dr. Julie Larrieu, a clinical and developmental psychologist who was appointed by the court to conduct an evaluation in 1997, offered testimony to the court. She stated that she submitted one report to the court dated August 4, 1997, and a subsequent report dated October 28, 1998.
In preparation for the first report, Dr. Larrieu interviewed both parties, Sean and Nicholas Tamm, and Jules Sider, who is now living with Ms. Carrick. She also conducted interviews with various therapists for Sean and Mr. Plaisance, supervisors of visitation and a former neighbor of Ms. Carrick and Mr. Plaisance when they were together. She also reviewed depositions and testimony offered by various witnesses in this case, and Dr. Klein's 1995 report.
Medical history collected on Sean shows that he has had problems from birth. He has a severe speech defect and is described as having aggressive outbursts and temper tantrums as early as eighteen-months-old. He has an extensive history of psychiatric problems. Several diagnosis on Sean conclude that he has disruptive behavior disorders, post traumatic stress disorder and depression. Sean's first hospitalization came when he was six-years-old. The social history referenced in that hospitalization indicates that Sean threw Nicholas out of a truck while they were visiting their father. In a subsequent hospitalization *636 it was reported that after an altercation with Nicholas in the back seat of a car, Sean began to beat his mother over the head with a game. She pulled over to the side of the road and put Sean in the front seat, but that did not solve the problem because Sean began pulling the steering wheel.
Dr. Larrieu explained that post traumatic stress disorder is caused by experiencing a trauma outside of the normal experience. Several symptoms are displayed by individuals with this disorder. They may avoid reminders of the trauma, they may be hyper-vigilance, exhibiting startle responses and hyper-arousal on the reminders of the trauma. Causes of post traumatic stress disorder could include abuse, and exposure to violence in the home. Specifically, she stated that discipline measures reportedly used by Ms. Carrick including the use of duck tape on the mouth and hands for restraint, and locking Sean in a closet, could also cause the disorder.
Dr. Larrieu expressed concerns for Sebastian's safety in Ms. Carrick's home. Dr. Larrieu cited Sean's lengthy history of rage and aggressive behavior. At the time of the report in 1997, Sean had been hospitalized ten times for uncontrollable behavior which included violence toward his brother, Nicholas, and his mother. Dr. Larrieu opined that institutionalization may be necessary. Dr. Larrieu expressed serious concerns that Sebastian would be harmed if left in Sean's presence.
Dr. Larrieu testified that Sebastian confided in her that Sean had already harmed him. Further, one of the supervisors of visitation expressed to Dr. Larrieu that Sebastian is the most aggressive child she has ever supervised. He is very angry, does not have "good boundaries", and is violent. He was seen screaming at, kicking, and jumping on his father during visitations. Sebastian revealed to the supervisor that his brothers at home "punch me and grab me around the throat".
In her interview with Sean he stated that he had made up the story about the abuse, and only discussed it in the hospital because he thought if he did so he would be released. Dr. Larrieu testified that she had concerns about the validity of the allegations of sexual abuse because they were never validated by authorities. She also found inconsistencies in the allegations in the reports she read. Further, she stated that she spoke with Sean's current therapist in Mississippi who confirmed that Sean had recanted his testimony about the abuse.
Dr. Larrieu also expressed concerns regarding Ms. Carrick's parenting ability. She was particularly concerned about the reports of the use of duck tape to restrain Sean. Further, Sebastian recently revealed to Dr. Larrieu that his mother had repeatedly beaten Sean with a plastic baseball bat. There is also evidence in various reports that Ms. Carrick uses vulgar language in the presence of her children.
Dr. Larrieu testified that she observed excessive aggressive behavior toward Mr. Plaisance by Sebastian. He would hit and kick his father and appeared very angry. When Mr. Plaisance told Sebastian he loved him, Sebastian responded by trying to choke Mr. Plaisance. Shortly thereafter, Sebastian amazingly changed his behavior and hugged his father. Sebastian said that he wanted his mother, but that she did not want to be around Mr. Plaisance. Dr. Larrieu's conclusion was that Sabastian was confused about his parents and his place in their lives.
Dr. Larrieu reviewed video tapes of visitation between Mr. Plaisance and Sebastian. On one of the tapes Sebastian's face appears bruised and his lip is split. She believed that Sebastian said that his brothers caused the harm.
Dr. Larrieu testified that she reviewed the reports of abuse and interviewed Mr. Plaisance and concluded that Mr. Plaisance did not perpetrate any physical abuse on Sean, Nicholas or Sebastian. She also reviewed Dr. Klein's findings, although Dr. Larrieu did not conduct tests *637 of her own. She opined that there was nothing in the reports that indicated to her that Mr. Plaisance was not capable of parenting. Dr. Larrieu testified that Ms. Diane Huber, another court appointed evaluator, discussed her opinion of the allegations of abuse during her interview. Ms. Huber told Dr. Larrieu that she found no evidence during her evaluation of any misconduct by Mr. Plaisance. Ms. Huber opined that the allegations of abuse were suggested by Ms. Carrick as a attempt to alienate Sebastian from his father.
In her observations, Dr. Larrieu found Mr. Plaisance to be patient and warm. He is nurturing and responsive to Sebastian. Dr. Larrrieu has also observed Mr. Plaisance interact with his other son, Paul III. Mr. Plaisance had successfully parented Paul, who had very intense and special needs because of his handicap. Paul is restricted to a wheelchair and must be restrained to prevent falls, because he is unable to hold himself in the chair.
Dr. Larrieu testified that her interviews with officials involved in the visitation gave her concerns that Ms. Carrick was not facilitating the visitation and telephone contact between Mr. Plaisance and his son. Further, Dr. Larrieu's impression was that Ms. Carrick speaks negatively to Sebastian about his father.
Dr. Larrieu testified that she reviewed the transcript of the police investigation conducted of the allegations of abuse made by Nicholas. Her conclusions were that the interview was not conducted in accordance with accepted guidelines in that suggestive questions were asked and Ms. Carrick was present during the interview.
Dr. Larrieu stated that Sebastian is in danger of developing an adverse behavior pattern as a consequence of the behavior to which he is exposed in Ms. Carrick's home. At one point during Dr. Larrieu's interview with Ms. Carrick, Sebastian was in another room with his maternal grandmother. The child began kicking and pounding a chair in a fit of uncontrollable behavior. The child was so disruptive, the interview had to be stopped. Such outbursts of disruptive behavior by Sebastian were also reported to Dr. Larrieu by Nicholas, Sean and Sebastian's teacher.
In conclusion, Dr. Larrieu stated that Mr. Plaisance could successfully parent Sebastian. She cited Mr. Plaisance's ability to structure situations well, and his warmth and nurturing ability is compelling considering the demands of caring for Paul, III. Dr. Larrieu uncovered no evidence which would suggest that having Sebastian in the home would overwhelm Mr. Plaisance in any way.
Her recommendation was that Mr. Plaisance should be awarded sole custody of Sebastian, with supervised visitation granted to Ms. Carrick. Dr. Larrieu testified that the supervised visitation was necessary to prevent Ms. Carrick from imparting negative feelings to Sebastian about his father. She did not feel that Sebastian was in danger of physical abuse from Ms. Carrick, who had received parenting information and was working toward being a better parent. Ms. Carrick no longer uses physical punishment. Dr. Larrieu felt Sebastian needed to continue the bond he has with his half-brothers, but would only advise supervised visitation with Sean. Dr. Larrieu stated that there would be adjustments to be made, but there would be substantial advantages to Sebastian to justify the change of custody.
On cross-examination Dr. Larrieu testified that in her original report she recommended joint custody, with Ms. Carrick as the domiciliary parent. In the preparation of the second evaluation, Dr. Larrieu only interviewed Mr. Plaisance, Ms. Carrick and Sebastian in person. She also conducted telephone interviews with others to come to a final conclusion. Dr. Larrieu testified that sexual abuse could cause a child to develop, or increase disruptive behavior. Her reports were made part of the record.
The third expert to testify was Diane Huber, a clinical social worker appointed *638 by the court to do a custody evaluation in 1993, when the matter was first considered. She testified that there were no disclosures of sexual abuse made to her. She did interview Ms. Carrick's former husband, Kenneth Tamm, who characterized Ms. Carrick as a violent person who had battered him during their marriage.
In Ms. Huber's assessment of the parties, she found Ms. Carrick to be very negative toward Mr. Plaisance. Ms. Carrick had nothing positive to say about Mr. Plaisance's parenting skills. Mr. Carrick refused to accept blame for any problems the children were having. Conversely, Ms. Huber found Mr. Plaisance to have "outstanding" parenting skills.
Ms. Huber also discussed Dr. Larrieu's second evaluation. Ms. Huber stated that Dr. Larrieu had interviewed her and several others in making the evaluation. Ms. Huber found Dr. Larrieu's evaluation to be thorough and in conformance with Ms. Huber's findings. Ms. Huber stated that she too was concerned for Sebastian's safety when around Sean, and concurred with the change of custody. Ms. Huber explained that a period of adjustment would be necessary for Sebastian; but that ultimately it would be in his best interest to live with his father.
Mr. Plaisance did not testify at trial. However, Ms. Carrick testified extensively. Ms. Carrick testified that she met Mr. Plaisance in October, 1989. At the time she was living in Metairie with her two sons, Sean and Nicholas. Shortly afterward, Mr. Plaisance moved in with Mr. Carrick and her two sons. She explained that her son, Sean, had an extreme speech disorder and was enrolled in private speech therapy. At that time Mr. Plaisance was working at a body shop and had flexible hours. Ms. Carrick was self-employed as an accountant. She was usually away from home during the day and Mr. Plaisance often cared for the children.
The couple was married on July 4, 1991 and on May 6, 1992 Sebastian Plaisance was born. The parties separated in July, 1992, and subsequently divorced. However, Mr. Plaisance continued to have contact with Sean and Nicholas after the separation. At this point, seven-year-old Sean's behavior began to change. He left school without authorization and returned home. Consultations with the school psychiatrist revealed that Sean was concerned that his mother would be harmed; although the basis and nature of the fear was uncertain. Sean began acting out sexually and violently. On one occasion when Sabastian was an infant, Sean "danced around the baby and went through the motions of pulling down his pants and pulling out his penis and sticking it in the baby's mouth". Other inappropriate sexual behavior was observed by Ms. Carrick's friend Terry Carbo.
Disturbed by this behavior in her son, Ms. Carrick sought professional help. Sean began therapy with Dr. Hassinger and Joy Seagrist. For most of 1993 and 1994, Sean was either hospitalized or institutionalized because he was extremely fearful and unable to cope at home.
In May, 1994, Nicholas told Ms. Carrick that he and his brother, Sean, were physically abused by Mr. Plaisance. The child also told his mother that Mr. Plaisance "did something else". Nicholas tried to encourage Sean to tell their mother what Mr. Plaisance did to him, but Sean was reluctant. After this revelation by Nicholas, Ms. Carrick notified Child Protection authorities, and officials at Southeast Louisiana Hospital, where Sean was confined. Dana Joseph of Child Protection came out to investigate the matter and spoke to Nicholas outside of Ms. Carrick's presence.
Ms. Carrick also notified Jefferson Parish Sheriff's Office of the reports of abuse. That complaint was registered in the fall of 1994, and Nicholas was interviewed by Sheriff's deputies in October, 1994. Then he began to divulge details of the abuse to Ms. Carrick. Nicholas described being forced to engaged in oral sex and being burned with a "stick thing". Nicholas described *639 having to act as a "lookout" when Ms. Plaisance was sexually abusing Sean. Shortly afterward, Nicholas began therapy with Darren Schwartz, a social worker.
Ms. Carrick stated that she moved to Mississippi in 1996. On one occasion when she was driving home from a visitation, Sebastian was chanting "candy, candy, you want candy, you better kiss my tail". Ms. Carrick explained that Sebastian referred to his penis as a tail. When Ms. Carrick asked the child where he heard that, Sebastian responded that he has know that since he was born. At a later date, Sebastian told Ms. Carrick that his father wanted him to "kiss his tail", but he refused.
Ms. Carrick testified that after she moved to Mississippi, she continued with visitation at the Divorce Center. However, there was an interruption in the visits when a problem developed with Ms. Scarborough, who supervised the visitation from January, 1995 until May of 1996. Visitation continued with Ms. Backe until February, 1997, when the Divorce Center refused to continue the service because of Mr. Plaisance's uncooperativeness. Ms. Carrick was subsequently able to find new supervised visitation in July, 1998. However, Mr. Plaisance did not show up for all of the scheduled visits. Visitation resumed in August, 1998. Ms. Carrick testified that she failed to bring Sebastian for visitation on two occasions, one due to flooding and one due to illness.
Ms. Carrick stated that Mr. Plaisance did not telephone Sebastian until about June, 1998. Then he began to call on a regular basis. There was about a one year period of time during which Mr. Plaisance did not attempt to visit or call his son.
When questioned about concerns expressed regarding Sebastian's safety around Sean, Ms. Carrick testified that Sean is currently on medication and is rehospitalized if his behavior becomes out of control for any reason.
Ms. Carrick testified that she currently works about twenty-five hours a week and has ample free time to devote to her three boys. She explained that she is required to work every other weekend, so she arranges that on those weekends her boys visit with their father. She now lives on fifteen acres with a creek, which the children love.
Ms. Carrick testified that her parenting methods have improved. She uses privilege removal and isolation in their rooms as the consequences of inappropriate behavior. She no longer uses physical discipline. Ms. Carrick testified that she had many discussions with Sean and Nicholas about Sebastian and they were concerned with Sebastian's safety while on visits with Mr. Plaisance. Sean particularly asked her to avoid sending Sebastian for visitation.
The court also heard extensive testimony from Sean's therapists, and the police officer who investigated that accusation of sexual abuse.
Dan Thibodeaux, a counselor at a local mental health clinic with thirteen years of experience, testified that he first saw Sean in February, 1995, after he had been recently released from a mental hospital. Sean was evaluated by a doctor on the staff and then assigned to Mr. Thibodeaux for individual therapy. Sean's diagnosis was oppositional defiant disorder and post traumatic stress disorder. Sean was angry and aggressive, and was having serious behavioral problems at home and at school.
Some of the sessions were with Sean alone, and some were family sessions. At the first session, Sean was quick to talk about the sex abuse with Mr. Thibodeaux. Sean told the counselor that he has had to talk about it so much, presumably because of the extensive hospital confinement. At that session, Sean described details of the sexual abuse and also of physical abuse. Mr. Thibodeaux conducted eleven sessions with Sean. During the course of the treatment, Mr. Thibodeaux met with Nicholas, Sebastian and Ms. Carrick. Nicholas was having similar problems of anger and aggression. *640 The sessions did not go well, and Sean had to be re-admitted to the hospital.
Mr. Thibodeaux also treated Nicholas over the course of seventeen sessions. In the fifth session, Nicholas began to speak of abuse by his step-father. Nicholas stated that Mr. Plaisance used a welding iron to heat a metal rod which he used to burn him three times. He showed Mr. Thibodeaux a mark which was healed. Mr. Thibodeaux admitted on cross-examination that there was no definitive physical evidence of the burn.
Nicholas also reported that Mr. Plaisance made him jump off of a high roof on a building he described as the "clubhouse". Nicholas also reported being punched in the abdomen and groin area. These descriptions of abuse matched those reported by Sean. As the relationship between Mr. Thibodeaux and Nicholas developed and the child became more comfortable, he began to relate details of sexual abuse. His description of the abuse was similar to that given by Sean. Mr. Thibodeaux did not detect anything which would indicate that either boy had been coached. Their behavior and emotions displayed when talking about the abuse was consistent with children who are telling the truth. With Sean the talk of abuse came immediately because he was desensitized to the subject due to the extensive therapy. Nicholas was much more reluctant to discuss the abuse. Mr. Thibodeaux first had to gain Nicholas' trust. Then, Nicholas spoke of the abuse with a lot of emotion which is normal and consistent with a child who is telling the truth.
Dr. Carmen Ramos, a child psychiatrist at the Southeast Hospital in Mandeville, testified that she was the attending physician who treated Sean while he was hospitalized. Sean was diagnosed as having post traumatic stress disorder and oppositional defiant disorder. The diagnosis was made based on the history and the material that developed in his therapy sessions. Dr. Ramos explained that oppositional defiant disorder is a disruptive disorder which causes the patient to have persistent and continuous difficulties with authority. It is displayed in a home and a school setting.
Sean was repeatedly hospitalized and had previously disclosed sexual abuse by his step-father. While he did not disclose the abuse to Dr. Ramos, he did tell a social worker under Dr. Ramos' supervision. Sean was extremely anxious and had a difficult time relating the sexual abuse. It caused him a lot of emotional effort to be able to finally open up about it, and there was a direct relationship between his progress and his ability to work on those issues in therapy. As he was able to verbalize his feelings about his step-father, his anger began to decrease and he began to show improvement. Dr. Ramos attempted to put Sean in group therapy with other children who were sexually abused, but he had to be removed because he was too disruptive.
Dr. Ramos last saw Sean in August, 1995, when he was transferred back to East Jefferson Mental Health Clinic for follow-up. The recommendations were that Sean continue on the medications and that he maintain therapy with the same therapist he had when he left the hospital. Dr. Ramos opined that Sean's behavior and disorders were consistent with abuse. Sean never mentioned having any trouble with his biological father, and only became anxious and frightened when he was faced with seeing his step-father.
Lieutenant Antoinette Ulmer, of the Domestic Violence Unit of the Jefferson Parish Sheriff's Department, testified that she investigated the allegations of sexual abuse made against Mr. Plaisance by Nicholas and Sean. Her testimony regarding the information obtained in the interviews with the two boys is consistent with other information offered by testimony given by other witnesses who found the allegations consistent with sexual abuse. However, *641 no charges were filed against Mr. Plaisance.
The court also heard testimony from Betsy Backe, of the Divorce Center, where Mr. Plaisance had supervised visits with his son. She stated that she terminated Kim Scarbrough who had previously supervised the visits for about two years, because she was not vigilant in her supervision of the visits.
Ms. Backe, testified that she conducted the intake interviews with the parents. She had to terminate Mr. Plaisance's interview on June 5, 1996 after only ten minutes because his behavior was inappropriate. He refused to listen to anything Ms. Backe said and continued to express his hostility toward Ms. Carrick and the Center. Mr. Plaisance returned to the Center on July 10, 1996 for a second attempt at the intake interview. Supervised visitation at the Center began on December 12, 1996 and continued until February 21, 1997 when it was terminated due to Mr. Plaisance belligerent behavior. At that visitation he insisted on videotaping Sebastian. When told that would be against the Center's policies, Mr. Plaisance became very hostile. He also sent a very inappropriate, suggestive letter to one of the supervisors.
Ms. Backe further testified that she had no problem with Ms. Carrick keeping the visitation appointments. After Mr. Plaisance's visitation was terminated by the Center, Ms. Carrick called to ask officials at the Center to re-consider. She told Ms. Backe that she wanted Sebastian to see Mr. Plaisance. However, Ms. Backe did not change her decision. Further attempts by Ms. Carrick to make appointments for visitation at the Center were refused.
Terry Carbo, a friend of Ms. Carrick, testified in Ms. Carrick's behalf. Her testimony was generally that Ms. Carrick was a loving and competent parent. She did discuss problems in Sean's behavior which she observed. Ms. Carbo testified that Sean would become "rageful" and throw things. His behavior worsened as he grew older. She has seen Sean go into a rage of anger during which he had to be physically restrained to keep him from harming others in the room. Ms. Carbo also testified that Sean acted out sexually in an inappropriate manner with her. Ms. Carbo stated that she saw Sean misbehave before Mr. Plaisance moved in; but it was shortly afterward that Sean's behavior was beyond control. Ms. Carbo testified that she attributed the deterioration in Sean's behavior to jealousy. She explained that when Mr. Plaisance moved in, he brought his severely handicapped son, Paul III, into the household. However, Ms. Carbo stated that her observation was that Sean was gentle and loving with Paul.
Ms. Carbo stated that she last saw Sean about three to four months before this testimony (December, 1998). At that time he was much better and in a "sweet frame of mind."
On cross-examination, Ms. Carbo admitted she saw Ms. Carrick use duck tape on her children's hands to keep them from striking her. She also saw Ms. Carrick lock her children in a closet. This was in the early 1990's and she has seen nothing of that nature recently.
Deputy David Lingoini, who has known Mr. Plaisance since elementary school, and supervised some of the visits after the Divorce Center terminated its relationship with the parties, testified for Mr. Plaisance. Deputy Lingoini stated that on the visits he observed a normal father/son relationship between Mr. Plaisance and Sebastian. He further testified that Mr. Plaisance had a clean and orderly house.
Anita Milling, who conducts seminars to help parents and siblings of severely handicapped children, testified that she has worked with Mr. Plaisance. She stated that he seems to take excellent care of his severely handicapped son, Paul.
The first matter for our consideration is the burden of proof necessary in the change of custody. In Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), the *642 Supreme Court imposed a heavy burden on a party attempting to persuade the court to change a "considered" degree in a custody case. That party must prove that the continuation of the existing custody plan is so deleterious to the child that a modification of the custody decree is warranted. The burden in such a case is clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, supra.
Since that pronouncement by the Supreme Court, this Court has distinguished the burden of proof in a motion for a custody decree when the decree is the result of a consent agreement by the parties. In such cases the heavy burden of Bergeron v. Bergeron, supra is inapplicable. When the custody order is by consent of the parties, and not a considered judgment made by the trial judge, the party seeking the change must show a material change in circumstances since the entry of the original decree and that the modification proposed is in the best interest of the child. Haik v. Haik, 94-563 (La.App. 5 Cir. 12/14/94) 648 So.2d 1015; Zanco v. Zanco, 97-342 (La.App. 5 Cir. 11/12/97), 703 So.2d 745; see also, Evans v. Lungrin, 97-0541, (La.2/6/98), 708 So.2d 731.
The Supreme Court defined a "considered" decree as an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children. Bergeron v. Bergeron, supra. In the instant case, the parties read a consent agreement into the record on December 8, 1992. At that time it is clear from the record that the court had not yet considered the merits of the custody issue. The parties agreed to give "temporary custody" to the mother, pending evaluations and recommendations on custody. The order of custody agreed to by the parties was not reduced to a written judgment until January 21, 1993. At that time the two opposing attorneys and Ms. Carrick signed the judgment. Mr. Plaisance did not sign. Accordingly, we find the judgment at issue in this appeal is a consent decree subject to the burden of proof set forth in Haik v. Haik, supra and Zanco v. Zanco, supra.
Having found that the decree in this matter is a consent decree, we must now decide whether Mr. Plaisance has met the burden of proving a material change in circumstances since the entry of the original decree, and that the modification proposed is in the best interest of the child. In ruling on this issue, the trial judge has made credibility determinations and finding of facts which this Court will not overturn absent an abuse of discretion. Rosell v. ESCO, 549 So.2d 840 (La.1989).
It is obvious from the record and the extensive reasons for judgment authored by the trial judge, that the gravity of this matter was appreciated by the trial court and that this matter was carefully considered. There was conflicting testimony offered by experts in this case. However, the most recent evaluations confirm that Sebastian is in danger of physical violence if he remains in Ms. Carrick's household. Sean still appears to have serious mental and emotional problems, and it is evident from Ms. Carrick's testimony that she may not understand, or acknowledge the full extent of the danger to Sebastian. Further, there is sufficient expert testimony to support the finding that the ramifications of the exposure to danger far outweighs the adjustments necessary from the change in custody. Given the facts of this case we do not find the trial court erred in rendering a considered decree of custody which granted sole to the father with supervised visitation granted to the mother. Accordingly, we affirm that judgment.
The second matter for our consideration is the judgment of the trial court granting Mr. Plaisance's motion for a decrease in child support. It appears that the trial court took the recommendation of the hearing officer and rendered an order which reduced Mr. Plaisance's child support to Ms. Carrick from July 3, 1996 through December 31, 1997 to $239.00 per month, and set child support to be paid by *643 Ms. Carrick at $210.00. The court based the amount of child support on Ms. Carrick's income at $1,430.00 per month based on a forty hour work week.
On appeal Ms. Carrick contends the trial court was manifestly erroneous in setting her income based on a forty hour week. Mr. Plaisance argues that the court obviously made a finding that Ms. Carrick was intentionally underemployed.
We find merit in Ms. Carrick's argument. She testified at trial that she is currently employed part time as an accountant because she is unable to find full time work. There was no evidence to dispute that offered by Ms. Carrick. We find nothing in the record to support the trial court's ruling that child support should be based on Ms. Carrick's full time employment. Accordingly, we vacate that portion of the May 21, 1999 judgment which sets child support owed by Ms. Carrick and remand the matter to the trial court for recalculation consistent with her testimony of the actual hours she works per month. In all other respects, that judgment is affirmed. For reasons discussed infra, we affirm the judgment of May 18, 1999.
JUDGMENT OF MAY 18, 1999 AFFIRMED; JUDGMENT OF MAY 21, 1999 AFFIRMED IN PART, VACATED IN PART AND REMANDED.
NOTES
[1] There is no judgment in the record regarding supervised visitation. Accordingly, it is not clear when this begin.